******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT EX REL. JEREMIAH
DUNN, CHIEF STATE ANIMAL CONTROL
OFFICER *v.* JOANN CONNELLY ET AL.
(AC 46113)

Elgo, Seeley and Bishop, Js.

*Syllabus*

The defendant C appealed from the judgment of the trial court vesting in
the plaintiff ownership of certain animals the court found to be neglected
after they were seized subsequent to a warrantless search of C's property,
where she operated an animal rescue. C claimed, inter alia, that the court
improperly denied her motion in limine, which sought to exclude all evidence
seized following the search on the basis of its determination that the exclu-
sionary rule did not apply to animal welfare proceedings brought pursuant
to statute (§ 22-329a). *Held*:

This court concluded, under the balancing test set forth in *United States*
v. *Janis* (428 U.S. 433), that the trial court's ruling denying C's motion in
limine was legally and logically correct, that court having correctly deter-
mined that the exclusionary rule was inapplicable in civil proceedings, as
the minimal deterrent effect of employing the rule in the circumstances at
issue was substantially outweighed by the societal interest in presenting
reliable evidence of animal neglect in actions under § 22-329a to protect the
health and safety of animals.

C waived her claim that she was entitled to a jury trial under article first,
§ 19, of the state constitution, as she never requested a jury trial and made
no objection prior to the start of the proceedings, in which she actively
participated.

Argued May 23—officially released October 8, 2024

*Procedural History*

Verified petition seeking, inter alia, custody in favor
of the plaintiff of certain animals in the named defen-
dant's possession that allegedly were neglected or cru-
elly treated, and for other relief, brought to the Superior
Court in the judicial district of Hartford, where the
court, *Budzik, J.*, issued an order vesting temporary
custody of the animals with the plaintiff; thereafter, the
court granted the named defendant's motion to reargue;

subsequently, the court, issued an order vesting temporary custody of the animals with the plaintiff; thereafter, the court denied the named defendant's motion to exclude certain evidence; subsequently, the case was tried to the court, *Budzik, J.*; judgment vesting permanent ownership of the animals with the plaintiff, from which the named defendant appealed to this court. *Affirmed.*

*Trey Mayfield*, pro hac vice, with whom, on the brief, was *John J. Radshaw III*, for the appellant (named defendant).

*Daniel M. Salton*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Katherine A. Roseman*, assistant attorney general, for the appellee (plaintiff).

*Opinion*

SEELEY, J. The defendant Joann Connelly[1] appeals from the judgment of the trial court vesting permanent custody with the Department of Agriculture (department) of certain animals owned by the defendant, which included thirty-three dogs, twenty-eight cats, five ducks, three goats, one parakeet, and one pony. On appeal, the defendant claims that (1) the court improperly denied her motion in limine, which sought to exclude any evidence seized following a warrantless search of her property, on the basis of its determination that the exclusionary rule does not apply to civil proceedings, and (2) the animal welfare statute, General Statutes (Supp. 2022) § 22-329a[2] (g) and (h), violates her right

---

[1] CT Pregnant Dog and Cat Rescue, Inc. (rescue), an animal rescue operated by Connelly, also was named as a defendant in this matter. Because an appearance by counsel was not filed on behalf of the rescue by the deadline set by this court, the appeal was dismissed as to the rescue. In this opinion, our references to the defendant are to Connelly.

[2] All references in this opinion to § 22-329a are to the version of the statute codified in the 2022 supplement to the General Statutes unless otherwise indicated.

to a civil jury trial under article first, § 19, of the Connecticut constitution. We disagree and affirm the judgment of the court.

The following facts and procedural history are relevant to this appeal. The defendant is the owner of property located at 171 Porter Road in Hebron, at which she operates CT Pregnant Dog and Cat Rescue, Inc. (rescue). The rescue is wholly owned by the defendant and is a licensed animal importer registered with the state pursuant to General Statutes § 22-344 (e). The property serves as the defendant's primary residential and business address, and consists of 5.57 acres, including a two-story residential home, a barn or stable outbuilding, and several sheds. The defendant uses the house, barn and surrounding land to house and care for animals.

On March 23, 2022, Tanya Wescovich, an animal control officer with the plaintiff, the state of Connecticut, visited the property with an employee of the Department of Children and Families,[3] which had received a report that the defendant was abandoning the property and the animals being kept there. On the basis of Wescovich's observations during that visit, the next day, March 24, 2022, Wescovich, along with William A. Bell, the animal control officer for the town of Hebron, applied for a search and seizure warrant for the defendant's property in Hebron. The warrant application was granted by the Superior Court that same day.[4] On March

[3] An employee of the Department of Children and Families had contact with the defendant on March 21, 2022, concerning an unrelated matter.

[4] Specifically, the warrant granted permission to search "[t]he grounds, property, house, garage, trailers, vehicles, paddocks, barns and outbuildings located at 171 Porter Rd., Hebron, CT" for the following: "All animals on the property, alive or dead, including but not limited to dogs, cats, horses, goats, poultry and to have said animals evaluated and tested for dehydration, emaciation, physical condition, wounds, parasites, injuries and illness by a licensed veterinarian; all animal health and ownership records; collars, leashes, halters, lead ropes; photographs of animals; receipts and bills related to animal care and feeding; medication and syringes related to animal care."

25, 2022, Wescovich, along with members of the Connecticut State Police, animal control officers from the department and nearby towns, and officials from the Chatham Health District,[5] executed the warrant, seizing, in total, thirty-three dogs, twenty-eight cats, five ducks, three goats, one parakeet, and one pony.

On April 18, 2022, Jeremiah Dunn, the chief animal control officer of the plaintiff, filed a verified petition seeking permanent ownership of the animals pursuant to § 22-329a (b)[6] and (c),[7] as well as an application for an immediate ex parte order of temporary care and custody. The court, *Cobb*, *J.*, granted the application for an immediate ex parte order of temporary care and custody that same day and ordered a remote hearing to be held on April 22, 2022, at which the defendant had to show cause as to why the order of temporary care and custody should not continue. The remote hearing,

[5] The Chatham Health District serves the towns of Colchester, East Haddam, East Hampton, Hebron, Marlborough, and Portland, and has authority, pursuant to General Statutes § 19a-206, to "examine all nuisances and sources of filth injurious to the public health . . . ."

[6] General Statutes (Supp. 2022) § 22-329a (b) provides: "Any animal control officer or regional animal control officer appointed pursuant to section 22-328, 22-331 or 22-331a, as applicable, may take physical custody of any animal upon issuance of a warrant finding probable cause that such animal is neglected or is cruelly treated in violation of section 22-366, 22-415, 53-247, 53-248, 53-249, 53-249a, 53-250, 53-251 or 53-252, and shall thereupon proceed as provided in subsection (c) of this section except that if, in the opinion of a licensed veterinarian or the State Veterinarian, at any time after physical custody of such animal is taken, such animal is so injured or diseased that it should be euthanized immediately, such officer may have such animal humanely euthanized by a licensed veterinarian."

[7] General Statutes § 22-329a (c) provides: "Such officer shall file with the superior court which has venue over such matter or with the superior court for the judicial district of Hartford at Hartford a verified petition plainly stating such facts of neglect or cruel treatment as to bring such animal within the jurisdiction of the court and praying for appropriate action by the court in accordance with the provisions of this section. Upon the filing of such petition, the court shall cause a summons to be issued requiring the owner or owners or person having responsibility for the care of the animal, if known, to appear in court at the time and place named."

however, took place on April 29, 2022, at which the
defendant stipulated, through counsel, that she would
not contest the ex parte order vesting the temporary
care of the animals in the department. The court, *Bud-
zik, J.*, thus, ordered that day that temporary custody
of the animals be vested in the department.

The defendant subsequently filed a motion seeking
to withdraw her oral stipulation from the April 29, 2022
hearing, as well as a motion to reargue the court's April
29, 2022 order of temporary custody. In her motion to
reargue, the defendant asserted that new information
had come to light that created "a genuine issue of mate-
rial fact regarding the statutory underpinnings of the
plaintiff's claims in [the] verified petition." Specifically,
the defendant claimed that results of the examinations
performed "on each individual animal by licensed veter-
inarians after they were in the custody of the animal
control officers who had effectuated the seizure" were
not available at the time of the April 29, 2022 hearing,
and that the results of these examinations showed that
all but one animal were "healthy and apparently well
cared for." The court granted the defendant's motion
to reargue on May 18, 2022, and scheduled a new hearing
on the plaintiff's application for temporary custody on
May 26, 2022.

During the May 26, 2022 hearing, Wescovich and the
defendant both testified. By agreement of the parties,
the court admitted into evidence twenty-nine exhibits,
consisting of, inter alia, photographs taken during the
March 25, 2022 seizure of the animals, as well as veteri-
nary reports documenting the physical condition of the
animals. In a memorandum of decision dated June 15,
2022, the court made the following findings. "On March
23, 2022 . . . Wescovich visited the property with an
employee of the . . . Department of Children and Fami-
lies . . . [which] had received a report that [the defen-
dant] was abandoning the property and the animals

being kept there. Upon accessing the property . . . Wescovich testified that she observed that the entire property was in an extreme state of uncleanliness and disarray.[8] Trash and unusable junk were everywhere. One dog was loose on the property. . . . Wescovich observed numerous large piles of trash, numerous empty plastic containers, numerous unused animal feed containers, a full garbage dumpster, and unused animal cages scattered about the property. A pile of trash blocked the entrance to the garage, and a dozen bags of trash were piled next to the house. The pictures of the property, house, and barn entered into evidence and examined by the court . . . corroborate . . . Wescovich's oral testimony and affidavit, which was also admitted into evidence as a full exhibit. . . .

"Upon walking within fifteen feet of the front door of the house . . . Wescovich detected an overwhelming odor of ammonia from the presence of urine and feces. Upon enter[ing] the house itself . . . Wescovich observed that the floors of the house were covered with cat and dog urine and feces, loose dog food, dirt, and newspaper clippings. . . . Wescovich testified that the air quality inside the house was so poor that she had difficulty breathing despite the use of an N95 respirator mask. . . . Wescovich also testified that the air in the house created a burning sensation in her eyes.

"On the first floor of the house . . . Wescovich observed approximately twenty-eight dogs in cages distributed throughout the first floor. Two additional dogs were loose in the house. . . . Wescovich observed that the first floor areas generally and each of the dogs' cages were, to be plain, filthy. The cages were soiled

[8] The court credited Wescovich's testimony with respect to her experience and observations regarding the subject property and animals. Specifically, the court stated in its memorandum of decision that Wescovich "has extensive training and experience in the investigation of animal neglect and abuse cases. . . . The court finds . . . Wescovich to be a very credible witness and credits [her] testimony."

with urine, feces, and used and soiled 'pee' pads. Old dog food kibble was strewn about the floor and in the dogs' cages.[9] . . .

"Wescovich observed cobwebs throughout the entire house. There were piles of trash and unusable junk everywhere. . . . Wescovich stated that it was difficult to move about the house because of the presence of so much trash and junk. Indeed, on March 25, 2022, the house was condemned by the Chatham Health District[10] as unfit for human habitation and in violation of [§ 19-13-B1 (i) of the Regulations of Connecticut State Agencies, which is part of the Connecticut Public Health Code].[11] . . . Wescovich also recovered numerous used and unused containers of various animal medicines and syringes . . . including canine distemper vaccine and sulfadimethoxine (trademarked as Albon). Possession and use of canine distemper vaccine and Albon is restricted.

---

[9] "Testifying in her defense, [the defendant] offered that the filthy state of the house was the result of behavioral issues associated with [the defendant's] minor [child] and [the child's] failure to clean the cages and house appropriately. The court does not credit [the defendant's] testimony. Moreover, in the exercise of common sense, human experience, and reasonable inference, the court concludes, in its role as fact finder, that the filthy and unsanitary conditions depicted in the photographs of the property, house, and barn were the result of lengthy and long-term neglect of the property, house, and the animals living there. For clarity and completeness, the court does not credit [the defendant's] testimony that the deplorable conditions depicted in the photographs of the property, house, and barn were the result of any failure to clean the house, barn, or property on the part of [the defendant's] minor [child], or [the defendant's] allegation that the animals were not properly walked on the morning they were seized. Similarly, in its role as fact finder, the court does not credit [the defendant's] allegation that the conditions at the property were the fault of her estranged husband."

[10] During the hearing, the plaintiff submitted as a full exhibit the notice of violation and public health order issued to the defendant, which stated that she was in violation of the health code provisions.

[11] Section 19-13-B1 of the Regulations of Connecticut State Agencies provides in relevant part that "[t]he following conditions are specifically declared to be public nuisances . . . (i) Buildings or any part thereof which are in a dilapidated or filthy condition which may endanger the life or health of persons living in the vicinity."

"On the second floor of the house . . . Wescovich found one cat in a cage and one cat loose in a bedroom. The cat's cage was unsanitary with dirty cat litter and feces. There was no litter box for the loose cat. Three other cats were confined to an upstairs bathroom. Another bedroom held a large, caged parakeet that was very thin. The parakeet subsequently died. The air quality was significantly worse on the second floor than on the first floor. There was also a strong smell of incense on the second floor, which, in the exercise of common sense, human experience, and reasonable inference, the court concludes, in its role as fact finder, was intended to cover up the smell of urine and feces throughout the house. Incense is harmful to the respiratory system of parakeets. . . . Wescovich observed the same filthy and unsanitary conditions on the second floor as on the first floor.

"Upon entering the basement area . . . Wescovich found fourteen cats in cages. Four more dogs were confined to kennels in the basement, and at least one dog was loose in the basement. The conditions in the basement were similar to the filthy and unsanitary conditions in the rest of the house. The floors of the cat cages and dog kennels were dirty with urine, feces, and spilled cat litter. Litter boxes were full. There were no clean places for the animals to sit. Garbage was piled in the corners of the basement and strewn about the basement generally.

"The barn and paddock area were similarly cluttered with trash and unusable junk. The paddock area contained such a large pile of fecal matter and hay that it blocked the entrance to the barn and was situated such that animals would have to walk through the pile to gain access to the barn. A pony and several goats and ducks lived in this area.

"After seizure from the property, the subject animals were taken to various local veterinary hospitals for

examination and treatment. . . . While [the defendant] is correct that the animals generally did not show signs of malnutrition or dehydration, many of the animals showed the detrimental effects of the filthy and unsanitary conditions they were forced to live in by [the defendant] and [the rescue]. Dermatitis or other skin and coat conditions (fleas, hair loss, matted coats, matted feces in their coats) were very common. Many cats had respiratory issues. Veterinarians commonly noted that the cats and dogs smelled strongly of urine or feces and [that] many animals had patching or urine scalds on their paw pads from standing in urine or feces for long periods of time. Gastrointestinal issues (ringworm, roundworm, tapeworm, hookworm, giardia, urinary tract infections, and diarrhea) were also common. Several cats or dogs were noted to be timid or fearful. One of the goats was malnourished and had lice." (Citations omitted; footnotes added; footnote in original.)

On the basis of these findings, the court found, by a preponderance of the evidence, that the defendant "abused, neglected, and cruelly treated the subject animals" by failing "to give the subject animals 'proper care' and [to] provide them with 'wholesome air,' as those terms are defined by General Statutes [Rev. to 2021] § 53-247."[12] Accordingly, the court vested temporary ownership of the animals with the department and

---

[12] General Statutes (Rev. to 2021) § 53-247 provides in relevant part: "(a) Any person who overdrives, drives when overloaded, overworks, tortures, deprives of necessary sustenance, mutilates or cruelly beats or kills or unjustifiably injures any animal, or who, having impounded or confined any animal, fails to give such animal proper care or neglects to cage or restrain any such animal from doing injury to itself or to another animal or fails to supply any such animal with wholesome air, food and water, or unjustifiably administers any poisonous or noxious drug or substance to any domestic animal or unjustifiably exposes any such drug or substance, with intent that the same shall be taken by an animal, or causes it to be done, or, having charge or custody of any animal, inflicts cruelty upon it or fails to provide it with proper food, drink or protection from the weather or abandons it or carries it or causes it to be carried in a cruel manner, or fights with or baits, harasses or worries any animal for the purpose of making it perform

ordered the defendant to pay a cash or surety bond of $500 per animal, which she did for all of the animals except the ducks.[13]

Subsequently, a hearing was scheduled for September 7, 2022, pursuant to § 22-329a (d), concerning the plaintiff's petition seeking permanent custody of the animals. At the commencement of that hearing, the defendant informed the court that she wanted to discharge her attorney. As a result, the court agreed to continue the hearing until October 18, 2022, to give the defendant the opportunity to retain new counsel. Immediately following the conclusion of the September 7 proceeding, the plaintiff filed a motion requesting that the court take judicial notice of the following for the upcoming October 18 hearing: (1) "The evidentiary exhibits entered in full during the . . . evidentiary hearing in the underlying matter on May 26, 2022"; (2) "[t]he full transcript and testimony of the May 26, 2022 hearing"; and (3) "[t]he court's memorandum of decision, including factual findings and legal conclusions, dated June 15, 2022 . . . ." The defendant's counsel responded by filing an objection to the motion for judicial notice. Therein, counsel asserted that he had "no objection to the [court's] taking judicial notice" of the evidentiary exhibits and the full transcript of the May 26 hearing, but requested that the court not take judicial notice of its June 15 decision, findings and conclusions. On September 22, 2022, the court granted the plaintiff's motion for judicial notice, stating in its order that "[t]he defendant [was] free to present additional evidence in order to attempt to convince the court that its prior factual findings were in error."

---

for amusement, diversion or exhibition, shall, for a first offense, be fined not more than one thousand dollars or imprisoned not more than one year or both, and for each subsequent offense, shall be guilty of a class D felony. . . ."

[13] On September 7, 2022, the court vested in the department permanent ownership of the ducks.

On September 27, 2022, the defendant filed a motion in limine seeking to exclude any evidence obtained from her property on the ground that the search and seizure at her home on March 23, 2022, without a warrant and over her objection, was unlawful, in violation of the fourth amendment to the federal constitution and article first, § 7, of the Connecticut constitution. The defendant further asserted that, even though the removal of the animals on March 25, 2022, was conducted pursuant to a warrant, it was clear that the basis for the issuance of the warrant was the illegal entry on March 23. The motion was signed by the defendant herself, not by counsel.

On October 3, 2022, the plaintiff filed an objection to the defendant's motion in limine, arguing that the motion was procedurally improper, as only the defendant, and not counsel, had signed the motion. The plaintiff claimed that, although the motion was signed by the defendant herself and "assert[ed] in the certification that she [was acting] 'pro se' . . . the defendant's counsel has made it clear . . . [that] he [was] still on retainer, and, in consultation with counsel, it appears he had no knowledge of this motion and did not review its contents prior to its filing. The defendant cannot simultaneously have representation and also represent herself. As is well settled in Connecticut jurisprudence, hybrid representation is not permitted in a civil context." The plaintiff further argued that the motion was waived and that the "exclusionary rule . . . has been categorically disallowed in civil actions."

On October 6, 2022, the court issued an order denying the defendant's motion in limine.[14] In its order, the court stated: "The exclusionary rule does not apply to civil

[14] Although the parties, in their appellate briefs and at oral argument before this court, also have referred to the defendant's motion as a motion to suppress, for consistency in this opinion we refer to the motion as a motion in limine.

cases." On October 12, 2022, the defendant, through counsel, filed a motion to reargue the court's order denying her motion in limine. In her motion to reargue, the defendant claimed that, although there are certain civil proceedings in which courts specifically have held that the exclusionary rule does not apply, "the law is different when it comes to matters involving the forfeiture of property where the proceeding is of a quasi-criminal nature." The court denied the defendant's motion to reargue.

On October 18, 2022, the court held a hearing on the plaintiff's petition for permanent custody of the animals. In doing so, it took judicial notice of the testimony presented at the May 26, 2022 temporary custody hearing, as well as the plaintiff's exhibits entered into evidence at the May 26 hearing, and they were entered into evidence at the October 18 hearing. At the beginning of the hearing, the defendant's counsel stated that the defendant took exception to the court's order denying the motion to reargue the court's denial of the motion in limine. The court reiterated its denial of the motion in limine, stating, "I don't think the exclusionary rule applies . . . for purposes of this case. I'm ruling that it does not. I agree with [plaintiff's] argument that this proceeding is civil in nature. I'd also note that the statute . . . at issue here is . . . for the protection of animals and . . . the safety and security of the animals at issue. It is not punitive in the sense [of] the case[15] . . . cited by the defendant. . . . It is to protect the animals, which would be another reason why I don't think the exclusionary rule applies.

"Finally, I think . . . that the defendant had ample opportunity to raise these issues at . . . probable

---

[15] The defendant cited to *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U.S. 693, 85 S. Ct. 1246, 14 L. Ed. 2d 170 (1965), in both her motion to reargue and at the beginning of the October 18, 2022 hearing, for the proposition that the exclusionary rule applies to a civil forfeiture proceeding in which a defendant's property is seized by the government. Id., 702.

cause hearings. She was, obviously, present when the circumstances upon which she's relying occurred. And to the extent that she had any objection to the evidence that was seized at that point, or any procedural issues with respect to [how] the [department] or any of the other police individuals acted, she could have raised that at the time and did not. The evidence that, I think, is at issue was entered by the court on the record without objection." (Footnote added.) The defendant's counsel then interjected that the defendant had not been "given any of the evidence, the video evidence . . . until some two months after" the May 26, 2022 hearing.

The court responded: "I understood that. But your client was present. The video simply shows the conduct of your client. And your client was present and could have instructed her attorney, based on her presence and knowledge of the circumstances, to file whatever objection she thought was appropriate. Or you could have made that evaluation based on simply consulting with your client. You didn't need the video to tell you what happened. She was there." At this point, the defendant responded by stating: "I [complained] multiple times. I'd like that on the record. And I've complained multiple times, my civil rights were violated. Multiple times. And I requested to speak out and to be heard." Although the court attempted to quiet the defendant, she continued to speak, and the following colloquy occurred:

"[The Defendant]: They illegally entered my house and stole my animals.

"The Court: Ma'am, you're only harming your argument by stating that you knew your civil rights were violated. That only makes my ruling stronger because you knew your civil rights were violated yet didn't object.

"[The Defendant]: I did.

"[The Court]: So, you should listen to your attorney.

"[The Defendant]: I wasn't allowed to.

"The Court: Ma'am. You should listen to your attorney and follow his advice."

Upon the conclusion of this exchange, the court began the trial. After the court admitted the evidence from the May 26, 2022 hearing, the plaintiff rested its case. Thereafter, the defendant called as witnesses Wescovich and Elizabeth Lee Murphy, a veterinarian. The defendant also testified at the hearing.

On December 13, 2022, the court issued its memorandum of decision vesting permanent ownership of all the animals with the department. In its memorandum of decision, the court "reaffirm[ed], readopt[ed], and incorporate[d] . . . all of the court's findings of fact as set forth in its June 15 [2022] memorandum of decision, as if fully set forth herein." The court then made the following additional findings related to the evidence presented during the defendant's case-in-chief. "Wescovich testified that she did not use any scientific measuring device to measure the air quality in [the defendant's] house . . . . Murphy has been a veterinarian since 1985. . . . Murphy testified that she had reviewed the [plaintiff's] exhibits and that the [plaintiff's] exhibits were the basis of her opinions. . . . Murphy did not examine any of the subject animals and never visited the property. . . . Murphy opined that, while the sanitary conditions in which the subject animals lived were 'not adequate' . . . the animals were [not] in life-threatening conditions and . . . had sufficient food, water, and shelter. . . . Murphy also testified that the house that the subject animals lived in was more like a 'barn,' and that, while a barn was 'probably not' a proper environment for the subject animals, the

conditions were not actually 'cruel' and the animals were not 'neglected,' in . . . Murphy's view. After . . . Murphy testified, [the defendant] testified that she spent a significant amount of money ($132,000) on veterinary bills for the subject animals in an effort to keep [them] healthy and well cared for, and that many of the gastro-intestinal issues suffered by the subject animals and documented in the veterinary records . . . were common in rescued animals." (Citation omitted.)

The court did not credit the portions of Murphy's testimony in which she opined that the animals had not been neglected or cruelly treated, as well as her testimony with respect to the specific medical conditions of the animals, as Murphy did not examine any of the animals. The court also specifically did not credit portions of the defendant's testimony. The court found, "by a preponderance of the evidence, that [the defendant] abused, neglected, and cruelly treated the subject animals . . . ." In making this finding, the court noted that the conditions at the property were unsanitary and filthy, and that the medical conditions of the animals reflected those unsanitary and filthy conditions. The court stated: "In particular, the long-term presence and accumulation of urine and feces [found at the defendant's property] produced an unwholesome air quality heavily laden with harmful ammonia gas. Nothing presented in the hearing on permanent custody changes the factual or legal conclusions reached by the court in its June 15, 2022 memorandum of decision on temporary custody. Indeed . . . Murphy affirmatively testified that the sanitary conditions in which the subject animals lived were 'not adequate,' and that the barn-like conditions the subject animals lived in were 'probably not' a proper environment for the . . . animals." The court concluded, on the basis of the evidence

before it, that "any person of ordinary intelligence" would have known that the conditions at the property did not meet the standard of proper care and wholesome air as required by § 53-247, and that the animals were neglected and cruelly treated by the defendant. The court, therefore, vested permanent ownership of the animals with the department pursuant to § 22-329a (g) (1).[16] This appeal followed.[17] Additional facts will be set forth as necessary.

## I

The defendant first claims that the trial court improperly denied her motion in limine on the basis of its

---

[16] The court also ordered the defendant to "pay the expenses incurred by the [plaintiff] in providing proper food, shelter and care to the subject animals calculated at the rate of fifteen dollars per day per animal from March 25, 2022, the date the subject animals were seized by the [plaintiff]."

[17] Following oral argument before this court, the defendant filed a notice of supplemental authority pursuant to Practice Book § 67-10, in which she referenced two cases that were mentioned at oral argument but not briefed, as well as a June 27, 2024 decision of the United States Supreme Court regarding the right to a jury trial under the seventh amendment to the federal constitution. In her notice, however, she also responded to questions raised by this court at oral argument and set forth arguments in support of her position on various issues raised. The plaintiff responded to the notice, pointing out that it was not in conformity with § 67-10 in that, in the notice, the defendant "engages in extensive supplemental argument . . . ." The plaintiff thus asserts that it should not be considered by this court, with the exception of the reference to the 2024 Supreme Court case, which the plaintiff maintains is not relevant to the present case. We agree with the plaintiff. Pursuant to § 67-10, "[w]hen pertinent and significant authorities come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, a party may promptly file with the appellate clerk a notice listing such supplemental authorities, including citations, with a copy certified to all counsel of record in accordance with Section 62-7. . . . The filing shall concisely and without argument state the relevance of the supplemental citations and shall include, where applicable, reference to the pertinent page(s) of the brief. . . . This section may not be used after oral argument to elaborate on points made or to address points not made." The defendant's notice is four pages in length, it includes argument, and it elaborates on and addresses issues raised at oral argument. For that reason, we limit our consideration to the 2024 Supreme Court decision referenced in the notice.

determination that the exclusionary rule, applicable in the context of a violation of the fourth amendment, does not apply to civil matters.[18] In support of this claim, the defendant asserts that the present case involves a civil forfeiture proceeding, to which the exclusionary rule applies.[19] Specifically, the defendant argues that the exclusionary rule applies to animal welfare proceedings[20] because such proceedings involve the civil forfeiture of noncontraband property, such as domesticated

[18] The plaintiff argues that the defendant did not preserve this claim for review on appeal. Specifically, the plaintiff asserts that, because the defendant voluntarily agreed at the May 26, 2022 temporary custody hearing to the admission into evidence of twenty-six exhibits, and because she subsequently represented that she had no objection to the plaintiff's motion requesting that the court take judicial notice of those exhibits and the testimony from the May 26 hearing for purposes of the October 18, 2022 permanent custody hearing, she waived any objection to the admission of that evidence, most of which derived from the alleged unconstitutional warrantless search of her residence on March 23, 2022. Thus, the plaintiff asserts that the defendant, having agreed to the admission of the evidence at the temporary custody hearing and having agreed with the plaintiff's request for the trial court to take judicial notice of that evidence for purposes of the upcoming permanent custody hearing, failed to preserve her fourth amendment claim that the evidence should have been suppressed as a result of the unlawful warrantless search of her home on March 23, 2022; accordingly, the plaintiff argues that this court should decline to review the claim. We are not persuaded by the plaintiff's arguments. Because the defendant filed her motion in limine seeking to exclude the evidence on fourth amendment grounds prior to the October 18 permanent custody hearing, at which the court took judicial notice of the challenged evidence, she revoked any prior consent she may have given to the admission of that evidence and, thus, did not waive her fourth amendment claim. We, therefore, proceed to a review of the merits of this claim.

[19] Although the defendant, in her motion in limine, argued that the warrantless entry into her home violated both the federal constitution and article first, § 7, of the state constitution, on appeal, she has neither raised nor briefed any claim under the state constitution relating to the warrantless entry of her home. Any such claim, therefore, is deemed abandoned. See, e.g., *Nietupski* v. *Del Castillo*, 196 Conn. App. 31, 37 n.7, 228 A.3d 1053 (failure to provide independent state constitutional analysis renders any claim with respect to state constitution abandoned), cert. denied, 335 Conn. 916, 229 A.3d 1045 (2020).

[20] We previously have identified a proceeding conducted pursuant to § 22-329a as an "animal welfare action . . . ." *Wethersfield ex rel. Monde* v. *Eser*, 211 Conn. App. 537, 539, 274 A.3d 203 (2022).

animals, regardless of whether a crime is alleged.[21] We disagree.

We first set forth the applicable standard of review. "The purpose of a motion in limine is to exclude irrelevant, inadmissible and prejudicial evidence from trial . . . ." (Internal quotation marks omitted.) *111 Clearview Drive, LLC* v. *Patrick*, 224 Conn. App. 419, 427, 313 A.3d 386 (2024). When a trial court's ruling pertaining to a motion in limine is based on a legal determination, "the applicable standard of review requires this court to determine whether the trial court was legally and logically correct . . . ." (Internal quotation marks omitted.) Id., 426. In the present case, because the court's determination that the exclusionary rule is inapplicable involved a legal determination, we exercise plenary review. See id.

A

The following legal principles are relevant to the defendant's claim that the exclusionary rule is applicable to a civil animal welfare proceeding. "The [f]ourth [a]mendment provides that, 'The right of the people to

---

[21] In her appellate brief, the defendant cites to a number of general principles underlying the fourth amendment, including, inter alia, that "the fourth amendment's warrant requirement applies to all governmental actors without regard to whether they describe their search and seizure endeavors as 'civil' or 'criminal.'" In doing so, the defendant argues that the fourth amendment is not limited in its application to criminal proceedings. The issue in this appeal, however, is not whether the fourth amendment was violated as a result of the warrantless search of the defendant's property on March 23, 2022. Rather, the issue in this appeal concerns the court's determination that the exclusionary rule does not apply to animal welfare proceedings, and that is the issue addressed on appeal by the plaintiff. The exclusionary rule is a prudential rule, not a constitutional rule, that was formulated in the criminal context to deter law enforcement officers who fail to obtain a warrant as required under the fourth amendment; its application necessarily must stem from a fourth amendment violation. Therefore, for purposes of this appeal, we assume, without deciding, that the warrantless search of the defendant's property on March 23, 2022, was conducted in violation of the fourth amendment.

be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' The basic purpose of this [a]mendment, as recognized in countless decisions of [the United States Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. The [f]ourth [a]mendment thus gives concrete expression to a right of the people which 'is basic to a free society.' . . . As such, the [f]ourth [a]mendment is enforceable against the [s]tates through the [f]ourteenth [a]mendment." (Citation omitted.) *Camara* v. *Municipal Court*, 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967); see also *Carpenter* v. *United States*, 585 U.S. 296, 303–304, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018); *State* v. *Bemer*, 339 Conn. 528, 533 n.6, 262 A.3d 1 (2021).

"The [f]ourth [a]mendment protects the right to be free from 'unreasonable searches and seizures,' but it is silent about how this right is to be enforced. To supplement the bare text, [the United States Supreme Court] created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a [f]ourth [a]mendment violation." *Davis* v. *United States*, 564 U.S. 229, 231–32, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). As such, the exclusionary rule "is a prudential doctrine . . . created by [the] [c]ourt to compel respect for the constitutional guarant[ee]. . . . Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. . . . The rule's sole purpose is to deter future [f]ourth [a]mendment violations." (Citations omitted; internal quotation marks omitted.) Id., 236–37. "[T]he exclusionary rule bars the government from introducing at trial

evidence obtained in violation of the . . . United States constitution. . . . The rule applies to evidence that is derived from unlawful government conduct, which is commonly referred to as the fruit of the poisonous tree . . . .” (Emphasis omitted; internal quotation marks omitted.) *State* v. *Romero*, 199 Conn. App. 39, 50, 235 A.3d 644, cert. denied, 335 Conn. 955, 238 A.3d 731 (2020).

“[T]he exclusionary rule is neither intended nor able to cure the invasion of the defendant’s rights which he has already suffered. . . . [T]he [exclusionary] rule’s prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the [f]ourth [a]mendment against unreasonable searches and seizures . . . . Application of the rule is thus appropriate in circumstances in which this purpose is likely to be furthered. . . . [I]n the complex and turbulent history of the rule, the [United States Supreme] Court never has applied it to exclude evidence from a civil proceeding, federal or state. *Immigration & Naturalization Service* v. *Lopez-Mendoza*, [468 U.S. 1032, 1041–42, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984)] (holding that rule does not apply in deportation proceedings); see also *Pennsylvania Board of Probation & Parole* v. *Scott*, 524 U.S. 357, 363, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998) (recognizing that [Supreme Court has] repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials and holding that rule was not applicable in parole revocation proceedings);[22]

---

[22] In *Pennsylvania Board of Probation & Parole*, the United States Supreme Court stated: “We have emphasized repeatedly that the government’s use of evidence obtained in violation of the [f]ourth [a]mendment does not itself violate the [c]onstitution. See, e.g., *United States* v. *Leon*, 468 U.S. 897, 906 [104 S. Ct. 3405, 82 L. Ed. 2d 677] (1984); *Stone* v. *Powell*, 428 U.S. 465, 482, 486 [96 S. Ct. 3037, 49 L. Ed. 2d 1067] (1976). Rather, a [f]ourth [a]mendment violation is fully accomplished by the illegal search or seizure, and no exclusion of evidence from a judicial or administrative proceeding can cure the invasion of the defendant’s rights which he has already suffered. *United States* v. *Leon*, [supra, 906] (quoting *Stone* v. *Powell*, [supra, 540] (White, J., dissenting)). The exclusionary rule is instead a judi-

*United States* v. *Janis*, 428 U.S. 433, 448, 454, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976) (holding that rule does not apply in civil tax proceedings); *United States* v. *Calandra*, 414 U.S. 338, 343–46, 94 S. Ct. 613, 38 L. Ed.

cially created means of deterring illegal searches and seizures. *United States* v. *Calandra*, 414 U.S. 338, 348 [94 S. Ct. 613, 38 L. Ed. 2d 561] (1974). As such, the rule does not proscribe the introduction of illegally seized evidence in all proceedings or against all [persons; *Stone* v. *Powell*, supra, 486], but applies only in contexts where its remedial objectives are thought most efficaciously [served. *United States* v. *Calandra*, supra, 348]; see also *United States* v. *Janis*, 428 U.S. 433, 454 [96 S. Ct. 3021, 49 L. Ed. 2d 1046] (1976) ([i]f . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted). Moreover, because the rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its substantial social costs. *United States* v. *Leon*, [supra] 907.

"Recognizing these costs, we have repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials. [Id., 909]; *United States* v. *Janis*, [supra, 428 U.S.] 447. For example, in *United States* v. *Calandra*, [supra, 414 U.S. 338] we held that the exclusionary rule does not apply to grand jury proceedings; in so doing, we emphasized that such proceedings play a special role in the law enforcement process and that the traditionally flexible, nonadversarial nature of those proceedings would be jeopardized by application of the rule. [Id., 343–46, 349–50]. Likewise, in *United States* v. *Janis*, [supra, 433] we held that the exclusionary rule did not bar the introduction of unconstitutionally obtained evidence in a civil tax proceeding because the costs of excluding relevant and reliable evidence would outweigh the marginal deterrence benefits, which, we noted, would be minimal because the use of the exclusionary rule in criminal trials already deterred illegal searches. [Id., 448, 454]. Finally, in [*Immigration & Naturalization Service*] v. *Lopez-Mendoza*, [supra, 468 U.S. 1032], we refused to extend the exclusionary rule to civil deportation proceedings, citing the high social costs of allowing an immigrant to remain illegally in this country and noting the incompatibility of the rule with the civil, administrative nature of those proceedings. [Id., 1050.]

"As in *Calandra*, *Janis*, and *Lopez-Mendoza*, we are asked to extend the operation of the exclusionary rule beyond the criminal trial context. We again decline to do so. Application of the exclusionary rule would both hinder the functioning of state parole systems and alter the traditionally flexible, administrative nature of parole revocation proceedings. The rule would provide only minimal deterrence benefits in this context, because application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches. We therefore hold that the federal exclusionary rule does not bar the introduction at parole revocation hearings of evidence seized in violation of parolees' [f]ourth [a]mendment rights." (Internal quotation marks omitted.) *Pennsylvania Board of Probation & Parole* v. *Scott*, supra, 524 U.S. 362–64.

2d 561 (1974) (holding that rule does not apply in grand jury proceedings). [B]ecause the rule is prudential rather than constitutionally mandated, [it has been held] to be applicable only where its deterrence benefits outweigh its substantial social costs. . . . *Pennsylvania Board of Probation & Parole* v. *Scott*, supra, 363. [T]he need for deterrence and hence the rationale for excluding the evidence are strongest where the [g]overnment's unlawful conduct would result in imposition of a criminal sanction on the victim of the search. . . . *Fishbein* v. *Kozlowski*, 252 Conn. 38, 52–53, 743 A.2d 1110 (1999)." (Citation omitted; footnote added; internal quotation marks omitted.) *Boyles* v. *Preston*, 68 Conn. App. 596, 611–13, 792 A.2d 878, cert. denied, 261 Conn. 901, 802 A.2d 853 (2002); see also *Davis* v. *United States*, supra, 564 U.S. 236–37 (because exclusionary "rule's sole purpose . . . is to deter future [f]ourth [a]mendment violations . . . [United States Supreme Court] cases have thus limited the rule's operation to situations in which this purpose is thought most efficaciously served" (citations omitted; internal quotation marks omitted)). "Because the exclusionary rule precludes consideration of reliable, probative evidence, it imposes significant costs: It undeniably detracts from the truth-finding process and allows many who would otherwise be incarcerated to escape the consequences of their actions. See *Stone* v. *Powell*, [428 U.S. 465, 490, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976)]. Although [the United States Supreme Court has] held these costs to be worth bearing in certain circumstances, [its] cases have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule. *United States* v. *Payner*, 447 U.S. 727, 734 [100 S. Ct. 2439, 65 L. Ed. 2d 468] (1980)." (Footnote omitted; internal quotation marks omitted.) *Pennsylvania Board of Probation & Parole* v. *Scott*, supra, 364–65.

Consistent with this precedent, this court previously has recognized, as a general rule, that the exclusionary rule does not apply to civil cases. See *Tompkins* v. *Freedom of Information Commission*, 136 Conn. App. 496, 499 n.4, 46 A.3d 291 (2012); *In re Nicholas R.*, 92 Conn. App. 316, 321, 884 A.2d 1059 (2005); see also *State* v. *Schroff*, 198 Conn. 405, 412, 503 A.2d 167 (1986) ("*Subject to a few exceptions*, the same rules of evidence apply in criminal cases as in civil cases. . . . The most notable exceptions are the exclusionary rules prohibiting the use of evidence obtained in violation of the accused's constitutional rights." (Citation omitted; emphasis added.)).

Nevertheless, the exclusionary rule has been applied beyond the confines of criminal cases "in a proceeding for forfeiture of an article used in violation of the criminal law. [See *One 1958 Plymouth Sedan* v. *Pennsylvania*], 380 U.S. 693 [85 S. Ct. 1246, 14 L. Ed. 2d 170] (1965) [*Plymouth Sedan*]. [In *Plymouth Sedan*, the court] expressly relied on the fact that 'forfeiture is clearly a penalty for the criminal offense' and '[i]t would be anomalous indeed, under these circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible.' " *United States* v. *Janis*, supra, 428 U.S. 447 n.17; see also *In re 650 Fifth Avenue & Related Properties*, 830 F.3d 66, 98 (2d Cir. 2016) ("[i]t is well-established that the [f]ourth [a]mendment's exclusionary rule applies in forfeiture cases"); *One 1995 Corvette VIN No. 1G1YY22P585103433* v. *Mayor & City Council of Baltimore*, 353 Md. 114, 123–24, 724 A.2d 680 ("Eleven of the thirteen United States Courts of Appeals have interpreted *Plymouth Sedan* to stand for the proposition that the exclusionary rule applies to civil in rem forfeitures. Additionally, courts in thirty-four states

have interpreted *Plymouth Sedan* to stand for the same
proposition. . . . Our examination of the cases has
revealed no court that completely rejects that interpre-
tation . . . .” (Footnotes omitted.)), cert. denied, 528
U.S. 927, 120 S. Ct. 321, 145 L. Ed. 2d 250 (1999).

The United States Supreme Court, thus, has not fore-
closed application of the exclusionary rule to civil pro-
ceedings. “Instead, the [c]ourt [has] instructed that the
exclusionary rule may be extended where the benefits
exceed the costs to society”; *Garrett* v. *Lehman*, 751
F.2d 997, 1003 (9th Cir. 1985); and it “set forth a frame-
work for deciding in what types of proceeding[s] appli-
cation of the exclusionary rule is appropriate. Imprecise
as the exercise may be, the [c]ourt recognized in [*United
States* v. *Janis*, supra, 428 U.S. 446] that there is no
choice but to weigh the likely social benefits of exclud-
ing unlawfully seized evidence against the likely costs.”
*Immigration & Naturalization Service* v. *Lopez-Men-
doza*, supra, 468 U.S. 1041; see also *Ahart* v. *Colorado
Dept. of Corrections*, 964 P.2d 517, 520 (Colo. 1998)
(“The question of whether the exclusionary rule applies
in a particular civil case requires weighing the deterrent
benefits of applying the rule against the societal cost
of excluding relevant evidence. . . . There is no ‘bright
line’ to determine when the rule should apply, and
courts must apply the *Janis* analytic framework on a
case by case basis.” (Citation omitted.)). This approach
is known as the *Janis* balancing test. See *Immigra-
tion & Naturalization Service* v. *Lopez-Mendoza*,
supra, 1042; see also *Long Lake Township* v. *Maxon*,
343 Mich. App. 319, 330, 997 N.W.2d 250 (2022) (“[t]he
*Janis* balancing test, as it is now known, requires a
court contemplating applying the exclusionary rule in
a civil proceeding to weigh the ‘prime purpose’ of the
rule—deterrence—against ‘the likely costs’ ”), aff’d,
Docket No. 164948, 2024 WL 1960615 (Mich. May 3,

2024). In applying that test, the Supreme Court determined in *Janis* that the exclusionary rule does not apply to a federal civil tax assessment proceeding and in *Lopez-Mendoza* that it does not apply to a deportation proceeding. See *United States* v. *Janis*, supra, 459–60; see also *Immigration & Naturalization Service* v. *Lopez-Mendoza*, supra, 1042.

Our appellate and trial courts have applied the *Janis* balancing test when determining whether the exclusionary rule applies to certain civil proceedings. See, e.g., *Fishbein* v. *Kozlowski*, supra, 252 Conn. 54 (applying *Janis* balancing test in determining that exclusionary rule does not apply to driver's license suspension hearings); *Payne* v. *Robinson*, 207 Conn. 565, 570, 541 A.2d 504 (applying *Janis* balancing test in determining that exclusionary rule does not apply to probation revocation proceedings), cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988); *Boyles* v. *Preston*, supra, 68 Conn. App. 612–13 (applying *Janis* balancing test in determining that exclusionary rule does not apply to civil trial); *Housing Authority* v. *Dawkins*, Superior Court, judicial district of Stamford-Norwalk, Housing Session at Norwalk, Docket No. 9502-16173 (May 10, 1995) (14 Conn. L. Rptr. 450) (applying *Janis* balancing test in determining that exclusionary rule does not apply in summary process proceeding), aff'd, 239 Conn. 793, 686 A.2d 994 (1997); see also *Tompkins* v. *Freedom of Information Commission*, supra, 136 Conn. App. 499 n.4 (standing for proposition that exclusionary rule categorically does not apply to civil proceedings), citing *In re Nicholas R.*, supra, 92 Conn. App. 321.[23]

---

[23] Although in *Tompkins*, we stated that the exclusionary rule does not apply to civil proceedings, the previously cited precedent from our Supreme Court indicates that application of the *Janis* balancing test is appropriate when deciding if the exclusionary rule applies to a particular civil proceeding. Notably, however, courts in Missouri, New Jersey and North Dakota forgo application of the *Janis* balancing test and, instead, simply regard the exclusionary rule as categorically inapplicable to civil proceedings, as we did in *Tompkins*. See, e.g., *Coble* v. *Director of Revenue*, 323 S.W.3d 74, 77 (Mo.

Accordingly, "United States Supreme Court precedent regarding the exclusionary rule's use in civil cases can be succinctly summarized as follows: it only applies in forfeiture actions when the thing being forfeited as a result of a criminal prosecution is worth more than the criminal fine that might be assessed. That's it." *Long Lake Township* v. *Maxon*, supra, 343 Mich. App. 332; see also *Dolan* v. *Salinas*, Superior Court, judicial district of New Britain, Docket No. CV 99-0494202-S (July 22, 1999) (25 Conn. L. Rptr. 119, 121) ("[t]he only civil context in which the [United States] Supreme Court has applied the exclusionary rule is a case of a 'quasi-criminal' forfeiture proceeding based on criminal conduct"). Further, "[i]t is unclear if the Supreme Court requires a threshold finding that the nature of the civil proceeding is 'quasi-criminal' . . . or if the nature of the proceeding is merely one factor in applying the *Janis* balancing test." (Citation omitted.) *Pike* v. *Gallagher*, 829 F. Supp. 1254, 1265 n.6 (D.N.M. 1993).

Notably, if a proceeding is identified as quasi-criminal, we have treated that as determinative of whether the exclusionary rule applies *without* requiring consideration of the *Janis* balancing test. See *In re Nicholas R.*, supra, 92 Conn. App. 321 n.3. In Connecticut, few proceedings are deemed to be quasi-criminal, and they include (1) "forfeiture proceeding[s] intended to penalize . . . for the commission of a criminal offense"; *Miller* v. *Dept. of Agriculture*, 168 Conn. App. 255, 269 n.15, 145 A.3d 393 (citing *One 1958 Plymouth Sedan* v. *Pennsylvania*, supra, 380 U.S. 702), cert. denied, 323 Conn. 936, 151 A.3d 386 (2016); (2) attorney disciplinary proceedings; *Burton* v. *Mottolese*, 267 Conn. 1, 19, 835

App. 2010) (exclusionary rule does not apply to civil proceedings); *In re Civil Commitment of J.M.B.*, 395 N.J. Super. 69, 95, 928 A.2d 102 (App. Div. 2007) (same), aff'd, 197 N.J. 563, 964 A.2d 752, cert. denied sub nom. *J.M.B.* v. *New Jersey*, 558 U.S. 999, 130 S. Ct. 509, 175 L. Ed. 2d 361 (2009); *Muscha* v. *Krolik*, 969 N.W.2d 142, 143 (N.D. 2022) (same).

A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004); and (3) juvenile delinquency proceedings. *In re Nicholas R.*, supra, 321 n.3; see also *In re Samantha C.*, 268 Conn. 614, 664, 847 A.2d 883 (2004) (proceedings to terminate parental rights are not quasi-criminal); *Robertson* v. *Apuzzo*, 170 Conn. 367, 375, 365 A.2d 824 (child paternity proceedings are civil, not quasi-criminal), cert. denied, 429 U.S. 852, 97 S. Ct. 142, 50 L. Ed. 2d 126 (1976); *Miller* v. *Dept. of Agriculture*, supra, 263–64 (administrative hearing on disposal orders for biting animals is not quasi-criminal).

Our courts have never reached the issue of whether animal welfare proceedings conducted pursuant to § 22-329a are subject to the exclusionary rule. Thus, in the present case, we first must determine whether the animal welfare proceeding at issue constitutes a forfeiture proceeding intended to penalize the defendant for a criminal offense. If it does, the exclusionary rule applies pursuant to *Plymouth Sedan*. If it does not, we next must determine whether animal welfare proceedings conducted pursuant to § 22-329a are quasi-criminal. If such proceedings are determined to be quasi-criminal, the exclusionary rule is applicable. Finally, even if we determine that animal welfare proceedings are not quasi-criminal in nature, we nevertheless must apply the *Janis* balancing test to determine whether it is appropriate to extend the exclusionary rule to this particular civil proceeding. In other words, if the proceeding at issue constitutes either a forfeiture akin to *Plymouth Sedan* or a quasi-criminal proceeding, the exclusionary rule applies; otherwise, the rule is inapplicable unless we determine, after applying the *Janis* balancing test, that it should be extended to animal welfare proceedings. We therefore turn to the defendant's claim that the animal welfare proceeding at issue in this case constitutes a civil forfeiture proceeding to which the exclusionary rule applies.

B

The defendant's claim that the animal welfare proceeding at issue in the present case constitutes a civil forfeiture of noncontraband property is premised on the principle that animals are considered property under state law.[24] In response, the plaintiff does not

[24] We note that, although the defendant correctly notes that animals are " 'generally . . . regarded as personal property,' " quoting *Nonhuman Rights Project, Inc.* v. *R.W. Commerford & Sons, Inc.*, 192 Conn. App. 36, 45, 216 A.3d 839, cert. denied, 333 Conn. 920, 217 A.3d 635 (2019), animals enjoy a unique status in our society as opposed to typical personal property. As the Supreme Court of Vermont stated, "nonhuman animals occupy a unique legal status in that they have traditionally been regarded as property *but are nonetheless different from other property*" and, instead, "occup[y] a special place somewhere in between a person and [a] piece of personal property." (Emphasis added; internal quotation marks omitted.) *State* v. *Sheperd*, 204 Vt. 592, 601, 170 A.3d 616 (2017); see id., 602 ("animal welfare is a factor [that must be] consider[ed] when determining whether a search or seizure was lawful"); *Baity* v. *Mickley-Gomez*, Docket No. CV-19-6092718-S, 2020 WL 9314537, *5 (Conn. Super. December 14, 2020) ("a domesticated, household pet holds a special and unique interest to its owner dissimilar to other property"); see also General Statutes § 22-350 (dogs are considered personal property under state law). In *State* v. *Newcomb*, 359 Or. 756, 770, 375 P.3d 434 (2016), the Oregon Supreme Court "conclude[d] that [the] defendant had no protected privacy interest in [his dog's] blood that was invaded by the medical procedures performed [to diagnose and treat the malnourished dog]. In [those] circumstances, [the court agreed] with the state that [a dog] is not analogous to, and should not be analyzed as though he were, an opaque inanimate container in which inanimate property or effects were being stored or concealed." The court recognized that, even though "[a] dog is personal property under Oregon law, a status that gives a dog owner rights of dominion and control over the dog . . . Oregon law simultaneously limits ownership and possessory rights in ways that it does not for inanimate property. Those limitations, too, are reflections of legal and social norms. Live animals under Oregon law are subject to statutory welfare protections that ensure their basic minimum care, including veterinary treatment. The obligation to provide that minimum care falls on any person who has custody and control of a dog or other animal." Id., 771. Likewise, under Connecticut law, although animals are generally considered personal property, they are subject to statutory welfare protections that place them in a category separate from inanimate property. Therefore, the defendant's citation to *Plymouth Sedan* and its progeny, which deal with forfeitures of assets like vehicles and currency, is unavailing in the present case because "in the context of searches and seizures . . . the treatment

dispute whether animals are considered property but argues that such proceedings do not constitute a civil forfeiture under this state's statutory scheme. We agree with the plaintiff.

Whether an animal welfare proceeding conducted pursuant to § 22-329a constitutes a civil forfeiture requires us to construe § 22-329a, "which presents a question of statutory interpretation subject to plenary review. See *Keller* v. *Beckenstein*, 305 Conn. 523, 532, 46 A.3d 102 (2012) ([i]ssues of statutory interpretation constitute questions of law over which the court's review is plenary . . .). When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . It is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Citation omitted; internal quotation marks omitted.) *Townsend* v. *Commissioner of Correction*, 226 Conn. App. 313, 330–31, 317 A.3d 1147 (2024). "[P]ursuant to § 1-2z, [the court is] to go through the following initial steps: [F]irst, consider the language of the statute at issue, including its relationship to other statutes, as applied to the facts of the case; second, if after the completion of step one, [the court] conclude[s] that, as so applied, there is but one likely or plausible meaning of the statutory language,

of animals is different from that of other types of property . . . ." *State* v. *Sheperd*, supra, 602.

[the court] stop[s] there; but third, if after the completion of step one, [the court] conclude[s] that, as applied to the facts of the case, there is more than one likely or plausible meaning of the statute, [the court] may consult other sources, beyond the statutory language, to ascertain the meaning of the statute.'' (Internal quotation marks omitted.) *State* v. *Smith*, 209 Conn. App. 296, 305, 268 A.3d 127 (2021), cert. denied, 342 Conn. 905, 270 A.3d 691 (2022).

Section 22-329a is titled: ''Seizure and custody of neglected or cruelly treated animals. Vesting of ownership of animal. Animal abuse cost recovery account.'' The statute provides a mechanism by which state animal control officials may take physical custody of an animal. First, under subsection (a), if an animal control officer has reasonable cause to believe that an animal ''is in imminent harm and is neglected or is cruelly treated,'' the animal control officer may take physical custody of the animal and, not later than ninety-six hours after taking custody, shall file with the Superior Court, in accordance with subsection (c), a verified petition ''plainly stating such facts of neglect or cruel treatment . . . and praying for appropriate action by the court . . . .'' Pursuant to subsection (b) of § 22-329a, ''[a]ny animal control officer . . . may take physical custody of any animal upon issuance of a warrant finding probable cause that such animal is neglected or is cruelly treated . . . .'' The statute further sets forth the necessary procedures after physical custody of an animal has been taken; see General Statutes § 22-329a (c) and (d); or if temporary custody of an animal is sought; see General Statutes (Supp. 2022) § 22-329a (e); and certain requirements of the animal's owner, including posting a bond and the payment of expenses incurred by the state for the care of the animal. See General Statutes (Supp. 2022) § 22-329a (f) and (h). The

language of § 22-329a is clear and unambiguous, and nowhere in the statute is the term "forfeiture" present.

By contrast, General Statutes § 54-33g, which governs the "[f]orfeiture of moneys and property related to [the] commission of [a] criminal offense," expressly provides that it applies to forfeitures. The same is true with respect to General Statutes § 54-36h, which governs the "[f]orfeiture of moneys and property related to [the] illegal sale or exchange of controlled substances or money laundering." See also General Statutes § 54-36a (f) and (g)[25] (referring to forfeiture of seized property). The omission of any reference to the term forfeiture in the plain language of § 22-329a, taken together with the existence of such references in statutes that do provide for forfeiture proceedings, indicates an intent that animal welfare proceedings conducted pursuant to the statute are not civil forfeiture proceedings. It necessarily follows that, if the legislature intended proceedings conducted pursuant to § 22-329a to be considered forfeiture actions, it would have drafted the statute in a manner similar to those forfeiture statutes. See *Stone* v. *East Coast Swappers, LLC*, 337 Conn. 589, 606–607, 255 A.3d 851 (2020) ("Our case law is clear . . . that when the legislature chooses to act, it is presumed to know how to draft legislation consistent with its intent and to know of all other existing statutes . . . . [I]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so . . . ." (Citations omitted; internal quotation marks omitted.)).

For example, in *State* v. *Richard P.*, 179 Conn. App. 676, 678, 181 A.3d 107, cert. denied, 328 Conn. 924, 181

---

[25] Although § 54-36a was amended in 2023; see Public Acts 2023, No. 23-79, § 51; that amendment has no bearing on this appeal. For simplicity, we refer to the current revision of the statute.

A.3d 567 (2018), the state argued on appeal that the trial "court improperly dismissed the case because [the state] had sufficiently represented to the court that a material witness had 'died, disappeared or became disabled' within the meaning of General Statutes § 54-56b . . . ." In making that argument, the state asserted that "the phrase 'has . . . become disabled' should be construed to be synonymous with 'has . . . become unavailable,' as that term is typically used in related contexts regarding witnesses." Id., 685–86. This court disagreed, reasoning: "The legislature has included the term 'unavailable' with respect to witnesses in other statutes. See, e.g., General Statutes §§ 54-86*l*, 52-180, 52-148b (b) (1), 46b-129 (k) (4) and (5), and 17a-11 (f) (5). Presumably, it chose not to do so when it enacted § 54-56b. '[A] court must construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions merely because it appears that good reasons exist for adding them. . . . The intent of the legislature, as this court has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature.' . . . *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006).

"This rule of statutory construction has been applied vigorously in instances in which the legislature has repeatedly employed a term in other statutes, but did not use it in the provision to be construed. As our Supreme Court stated in *Viera* v. *Cohen*, 283 Conn. 412, 431, 927 A.2d 843 (2007), 'we underscore that the legislature frequently has used the term withdrawal. . . . Typically, the omission of a word otherwise used in the statutes suggests that the legislature intended a different meaning for the alternate term.' . . . 'Where a statute, with reference to one subject contains a given

provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed.' . . . *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003). Accordingly, we find it significant that the legislature did not choose to include the term 'unavailable' in § 54-56b.

"Moreover, in other statutes concerning witnesses, the legislature explicitly has expressed its intent to include circumstances in which a witness is beyond the reach of process, or cannot be found, and thus cannot be compelled to testify. For example, in General Statutes § 52-160, the legislature provided that '[i]f any witness in a civil action is beyond the reach of the process of the courts of this state, or cannot be found . . . [a transcript of his or her recorded testimony in] a former trial of the action . . . shall be admissible in evidence, in the discretion of the court . . . .' Presumably, the legislature chose not to employ the same or similar language in § 54-56b, thereby indicating an intent that § 54-56b sweep less broadly." *State* v. *Richard P.*, supra, 179 Conn. App. 688–89. The analysis in *Richard P.* regarding legislative intent when a statute fails to include a term that is present in other statutes applies equally to the present case.

Furthermore, § 54-33g "provides for a civil action in rem for the condemnation and [forfeiture] of the [property] which was used in violation of the law. . . . In such an action the guilt or innocence of the owner of the [property] is not in issue. The only issue is whether the [property] was used in violation of law. This follows from the nature of the action which is one against the res, an action in rem." (Internal quotation marks omitted.) *State* v. *Connelly*, 194 Conn. 589, 592, 483 A.2d 1085 (1984). A "forfeiture" is defined as a procedure by which the government may divest a person of his

or her property without compensation. Black's Law Dictionary (12th Ed. 2024) p. 789. "It is an area of the law which is founded upon the many inherent fictions of our jurisprudence. . . . As perhaps the most obvious use of legal fiction, the civil forfeiture action is brought directly against the property as [the] defendant. The conceptual basis of the forfeiture is, quite basically, that the property has perpetrated some wrong. . . . Thus, as the action is against the property and not the owner, the action is in rem in nature." (Citations omitted.) *United States* (*Drug Enforcement Agency*) v. *In re One 1987 Jeep Wrangler Automobile VIN No. 2BCCL8132HBS12835*, 972 F.2d 472, 476 (2d Cir. 1992). "Modern civil-forfeiture statutes are plainly designed, at least in part, to punish the owner of property used for criminal purposes. See, e.g., *Austin* v. *United States*, 509 U.S. 602, [618–19, 113 S. Ct. 2801, 125 L. Ed. 2d 488] (1993). When a [s]tate wishes to punish one of its citizens, it ordinarily proceeds against the defendant personally (known as in personam), and in many cases it must provide the defendant with full criminal procedural protections. Nevertheless . . . [the United States Supreme] Court permits prosecutors seeking forfeiture to proceed against the property (known as in rem) and to do so civilly." (Emphasis omitted.) *Leonard* v. *Texas*, 580 U.S. 1178, 1179, 137 S. Ct. 847, 197 L. Ed. 2d 474 (2017) (statement of Thomas, J., concurring in denial of certiorari).

Although animal welfare proceedings under § 22-329a similarly are in rem actions, they differ from in rem *forfeiture* actions principally in that the animals subject to the custody order have not perpetrated some wrong, nor were they used for criminal purposes. The statute also is devoid of any language indicating that it is designed to punish property owners who abuse or neglect animals. Instead, the overarching purpose of

§ 22-329a is to protect the welfare of animals. See *Wethersfield ex rel. Monde* v. *Eser*, 211 Conn. App. 537, 551, 274 A.3d 203 (2022). In cases in which an animal control officer takes physical custody of animals that are neglected or cruelly treated, the owners must appear in court to show cause why the court should not vest in some suitable state, municipal or other public or private agency or person the animal's temporary care and custody pending a hearing. If, after a hearing, it is determined that the animal is not neglected or cruelly treated, the court may cause the animal to be returned to its owner. If custody of the animal is vested in the state, the owner must pay any expenses incurred by the state to provide proper food, shelter and care for the animal, not as a punishment. See, e.g., *Miller* v. *Dept. of Agriculture*, supra, 168 Conn. App. 269 n.16 ("A municipality may assess on the owner [of a seized animal] certain fees, including a nominal 'redemption fee' for owners claiming a captured or impounded animal, and a payment representing the cost to the municipality of quarantining a biting animal. General Statutes § 22-333. These fees, however, merely compensate a municipality for costs incurred while impounding an animal, and thus cannot be described as punitive in nature.").

We note that the defendant's briefing on this issue is minimal. After citing federal case law holding that the exclusionary rule applies to forfeiture cases, the defendant simply asserts, in a conclusory fashion, that "because the civil forfeiture action brought under . . . § 22-329a (g) to seize the dogs in [the defendant's] custody was to seize noncontraband property—domesticated animals—the fourth amendment's protections apply to the seizures underlying the search." She has provided no Connecticut authority to support her position that § 22-329a sets forth a procedure for civil forfei-

ture.[26] Therefore, in the absence of any authority demonstrating that § 22-329a provides for a civil forfeiture action, and keeping in mind that, "[w]hen construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature"; (internal quotation marks omitted) *Lawrence* v. *Gude*, 216 Conn. App. 624, 629, 285 A.3d 1198 (2022); we conclude that the plain language of § 22-329a indicates that proceedings brought under the statute are not forfeiture actions.[27]

[26] In her appellate reply brief, the defendant asserts that "[t]he fourth amendment's exclusionary rule applies to civil forfeiture proceedings brought to protect animal welfare, regardless of whether a crime is alleged." In support thereof, she cites to out-of-state authority and to *Plymouth Sedan*. As we have stated, *Plymouth Sedan* stands for the proposition that the exclusionary rule applies to civil in rem forfeitures. *Plymouth Sedan*, however, involved a civil forfeiture proceeding of an automobile brought under a Pennsylvania statute governing the forfeiture of vehicles used in the illegal transportation of liquor. The other out-of-state authority on which the defendant relies also is inapposite, as it does not suggest or in any way support the assertion that proceedings under § 22-329a are civil forfeiture proceedings.

[27] A consideration of other states' statutes that are similar in purpose to § 22-329a provides support for our conclusion, as, even though proceedings to seize animals in some states are considered forfeitures, the relevant statutes, unlike § 22-329a, specifically refer to the forfeiture of animals. In Illinois, for example, the Humane Care for Animals Act, 510 Ill. Comp. Stat. 70/3.04 (a) (West 2012), which "promotes the humane care and treatment of animals and punishes . . . for violations thereof," expressly provides for the "forfeiture" of animals. *People* v. *Koy*, 13 N.E.3d 1260, 1266–67 (Ill. App. 2014). "Section 3.04 (a) provides that the [s]tate's [a]ttorney may file a 'petition for forfeiture prior to trial' and that the only possible ramification of the petition is the permanent forfeiture of the animals seized in conjunction with [an] arrest. . . . Section 3.04 (a) allows the [s]tate to take action before trial, not [as a punishment] but, rather, in the spirit of the [a]ct, to ensure the well-being and continued recovery of the injured animals." Id., 1267. Similarly, in Mississippi, state law "provides that '[a]ll courts in the State of Mississippi may order the seizure of an animal by a law enforcement agency, for its care and protection upon a finding of probable cause to believe said animal is being cruelly treated, neglected or abandoned.' Miss. Code Ann. § 97-41-2 (1) (Rev. 2014). Subsection (2) allows an owner of a seized animal to request a hearing within five days of the seizure 'to determine whether the owner is able to provide adequately for the animal and is fit to have custody of the animal.' Miss. Code Ann. § 97-41-2 (2) (Rev. 2014). Subsection (3) provides a nonexhaustive list of what a court may consider

Therefore, because an animal welfare proceeding brought pursuant to § 22-329a does not constitute a civil forfeiture, it is not subject to the exclusionary rule pursuant to *Plymouth Sedan*.

C

Having determined that an animal welfare proceeding brought pursuant to § 22-329a is not a civil forfeiture proceeding, we now must determine whether such a proceeding is quasi-criminal in nature. The United States Supreme Court has described a "quasi-criminal" proceeding as one whose "object, like a criminal proceeding, is to penalize for the commission of an offense against the law." *One 1958 Plymouth Sedan* v. *Pennsylvania*, supra, 380 U.S. 700; see also *Ahart* v. *Colorado Dept. of Corrections*, supra, 964 P.2d 520 ("A proceeding is quasi-criminal if it provides for punishment but is civil in form. . . . The more similar the objective of a civil proceeding to the purpose of criminal proceedings—punishment for violations of the law—the more likely exclusion of the evidence will foster deterrence. Perhaps the clearest example of civil proceedings that are quasi-criminal are government suits seeking forfeiture of non-contraband property based on the theory

in determining whether the owner is fit to have custody of an animal . . . . Subsection (5) delineates the circumstances under which an animal may be permanently forfeited: 'If the court finds the owner of the animal is unable or unfit to adequately provide for the animal or that the animal is severely injured, diseased, or suffering, and therefore, not likely to recover, the court may order that the animal be permanently *forfeited* and released to an animal control agency, animal protection organization or to the appropriate entity to be euthanized or the court may order that such animal be sold at public sale in the manner now provided for judicial sales; any proceeds from such sale shall go first toward the payment of expenses and costs relating to the care and treatment of such animal, and any excess amount shall be paid to the owner of the animal.' Miss. Code Ann. § 97-41-2 (5) (Rev. 2014)." (Citation omitted; emphasis added.) *Dancy* v. *State*, 287 So. 3d 931, 936–37 (Miss. 2020); see also Wn. Rev. Code § 16.52.200 (3) (2020) (expressly providing for forfeiture of animal following conviction of animal cruelty).

that the owner used the property in the commission of a criminal offense." (Citation omitted.)).

We begin with the object of our state's animal welfare proceedings. The defendant argues that proceedings pursuant to § 22-329a, unlike our child abuse and neglect proceedings, are not remedial in nature. The plaintiff counters that animal welfare actions "are standalone, remedial civil actions designed to protect animals against neglect and abuse." We agree with the plaintiff.

Unlike civil forfeiture actions, which are meant to penalize the property owner,[28] remedial actions are those actions that are designed to protect the rights and interests of a specific, often vulnerable, group. See *Stone* v. *East Coast Swappers, LLC*, supra, 337 Conn. 600–601 (Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., is remedial measure designed to protect public); *First Federal Bank, FSB* v. *Whitney Development Corp.*, 237 Conn. 679, 688, 677 A.2d 1363 (1996) (tenant protection statute is remedial given its purpose to protect certain classes of tenants); see also *J.R.B.* v. *Dept. of Human Services*, 633 N.W.2d 33, 39 (Minn. App. 2001) (remedial statutes are those "designed to protect a specific class of individuals" and therefore shall be interpreted in favor of that class), review denied, Minnesota Supreme Court (October 24, 2001); *State ex rel. Ford* v. *Wenskay*, 824 S.W.2d 99, 100 (Mo. App. 1992) ("remedial statute is one 'enacted for the protection of life and property, or which introduce[s] some new regulation conducive to the public

[28] See *Garrett* v. *Lehman*, supra, 751 F.2d 1003 ("The exclusionary rule has been applied to forfeiture proceedings because they have been deemed to be 'quasi-criminal.' . . . The [c]ourt continues to instruct us, however, that the reason forfeiture proceedings are so characterized is that 'forfeiture is *clearly a penalty* for the criminal offense.' [*United States* v. *Janis*, supra 428 U.S. 447 n.17], quoting *One 1958 Plymouth Sedan* v. [*Pennsylvania*, supra, 380 U.S. 701] . . . ." (Citation omitted; emphasis in original.)).

good' "). "[R]emedial statutes should be construed liberally in favor of those whom the law is intended to [protect, and] exceptions to those statutes should be construed narrowly. . . . *Commission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342 Conn. 25, 37, 268 A.3d 630 (2022) . . . . [R]emedial statutes must be afforded a liberal construction in favor of those whom the legislature intended to benefit . . . ." (Citation omitted; internal quotation marks omitted.) *Russbach* v. *Yanez-Ventura*, 213 Conn. App. 77, 102, 277 A.3d 874, cert. denied, 345 Conn. 902, 282 A.3d 465 (2022).

With respect to the purpose of an animal welfare action, this court has stated previously that "it is clear from the legislative history that the primary purpose of § 22-329a (a) is not the protection of the owner, but rather the protection of animals from imminent harm."[29]

[29] "When discussing the 2007 amendment on the floor of the House of Representatives, Representative Gerry Fox explained the origins of the amendment: 'This bill came to us from the Commissioner of Agriculture and requested a change to the way that animal control officers currently handle situations where animals are treated cruelly or neglected. Presently, when an animal control officer sees a situation that may appear to be dangerous to an animal, they're required to go to court and get a warrant. What this would allow is if there's reasonable cause to believe that an animal [is] in imminent harm of being cruelly or negligently treated, the animal control officer may, at that time, seize the animal.' 50 H.R. Proc., Pt. 25, 2007 Sess., p. 8077, remarks of Representative Gerry Fox. In support of the legislation, Representative [Diana S.] Urban stated: 'This bill makes it much easier when there is an animal that is being subjected to cruel treatment or a cruel situation to get in and to mitigate that situation and be able to move the horse, the dog, the cat, the puppy, whatever it happens to be, out of that situation and into a place where they will be able to receive the treatment they need.' Id., pp. 8078–79, remarks of Representative Diana Urban. In the judiciary committee, the then Commissioner of Agriculture, F. Philip Prelli, explained that 'the Department of Agriculture is the lead agency in investigation of animal cruelty and negligence. . . . Even if it's done on a local level, the department is involved with those. The primary purpose of [this] legislative proposal is to better define and clarify the section to enable animal control officers to take physical custody of animals that animal control officers have a reasonable cause to believe are in imminent harm and are neglected and/or being cruelly treated. One of the things that

*Wethersfield ex rel. Monde* v. *Eser*, supra, 211 Conn. App. 551. In light of the clear purpose of animal welfare actions to protect the health and safety of animals, a vulnerable class, such actions are remedial and not punitive, and, thus, not quasi-criminal in nature.[30] The exclusionary rule, therefore, does not apply to animal welfare actions on the basis of quasi-criminality.

D

Finally, we must determine whether, pursuant to the *Janis* balancing test, the exclusionary rule applies to animal welfare actions. This court previously applied the *Janis* balancing test in *Payne* v. *Robinson*, 10 Conn. App. 395, 523 A.2d 917 (1987), aff'd, 207 Conn. 565, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). In *Payne*, this court was faced with the question of whether the exclusionary rule should apply to probation revocation proceedings. We

we've noticed about the law that's there, it's been a while since it's been modified, and the language tends to be language that was written a number of years ago. . . . Usually, the animal control officers will go in there and try to work with the people to either get the animals fed, get the treatment up right, so they're treated correctly, and then go to the steps. And if they still feel they need to take those steps, they will get a warrant first. So the steps we're defining here are never going to be the norm. But there are times when our animal control officers will see an animal that is truly in jeopardy of dying, and we've seen that. We've seen horses down, and we've seen cows down, where we've had to try to seize those animals and then go and get the court order. So what this does is then sets up the procedure that will give us the opportunity to seize the animals. Then within [ninety-six] hours, we will have to get a court order . . . .' Conn. Joint Standing Committee Hearings, Judiciary, Pt. 14, 2007 Sess., pp. 4422–23, remarks of Commissioner of Agriculture F. Philip Prelli." *Wethersfield ex rel. Monde* v. *Eser*, supra, 211 Conn. App. 549–50.

[30] This conclusion is also consistent with how this court has classified an animal disposal action. See, e.g., *Miller* v. *Dept. of Agriculture*, supra, 168 Conn. App. 268–69 ("An appeal of a disposal order for a biting animal pursuant to [General Statutes] § 22-358 (c) is not a criminal prosecution. The issuance of a disposal order under § 22-358 (c) does not, by itself, trigger the imposition of a fine or prison term on the owner. Rather, by obviating the threat that dangerous animals pose to the public, the provision is remedial and civil in nature." (Footnotes omitted.)).

explained the *Janis* balancing test as follows: "The exclusionary rule is . . . designed to deter future unlawful conduct on the part of law enforcement officers, and therefore the rule is to be applied in those instances when its deterrent purpose is likely to be served. . . . So, in deciding whether to extend the exclusionary rule to probation revocation hearings we must weigh the potential injury to the fact-finding process as a result of the exclusion of relevant evidence against the potential benefits of the rule as applied in this context."[31] (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 398.

In addressing this claim, we first look to child protection proceedings for guidance, as they share important similarities with animal welfare proceedings in that both seek to protect a vulnerable class or group and both are civil, and not quasi-criminal, in nature. See *In re Samantha C.*, supra, 268 Conn. 649 (child neglect proceedings are civil and not quasi-criminal); *In re Baby Girl B.*, 224 Conn 263, 282, 618 A.2d 1 (1992) (concluding that proceeding to terminate parental rights is civil action).[32] In *In re Nicholas R.*, supra, 92 Conn. App. 321, this court concluded that the exclusionary rule

---

[31] After applying that test, this court determined in *Payne* "that the potential injury to the function of the probation revocation proceedings substantially outweighed the deterrent effect to be gained by applying the exclusionary rule to [those] proceedings." *Payne* v. *Robinson*, supra, 10 Conn. App. 400. Accordingly, we concluded in *Payne* that the exclusionary rule did not apply to the probation revocation proceeding at issue. See id.

[32] See also *In re Felicia S.*, 1993 WL 576430, *9 (Conn. Super. May 21, 1993) ("A significant purpose of the criminal justice system is to punish the guilty. The purpose of child protection proceedings, however, is by definition to protect children. Although a parent whose child has been committed to [the Department of Children and Families] or whose parental rights have been terminated may feel punished, that result is purely ancillary to the fundamental purpose of protecting children. And, although the criminal justice system may have some role to play in protecting the public and the rights of individuals, its primary purpose is to adjudicate and punish the guilty."), aff'd sub nom. *In re Felicia D.*, 35 Conn. App. 490, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994).

does not apply to a civil, child neglect proceeding. Similarly, in *Matter of Diane P.*, 110 App. Div. 2d 354, 494 N.Y.S.2d 881 (1985), appeal dismissed, 67 N.Y.2d 918, 492 N.E.2d 1235, 501 N.Y.S.2d 1027 (1986), the Appellate Division of the Supreme Court of New York rejected the application of the exclusionary rule to a child protection proceeding. Specifically, the court concluded: "Upon weighing the likely deterrent effect of the exclusionary rule against its detrimental impact upon the fact-finding process and the [s]tate's enormous interest in protecting the welfare of children, we conclude that the rule should not be applied in [child protection] proceedings. Rather, its deterrence purpose will be adequately served by the fact that any evidence seized pursuant to an illegal search will be inadmissible in any related criminal proceeding." Id., 354. In reaching that conclusion, the court explained: "Principles of law designed to protect the citizenry from improper police activities should not be applied without regard to the grim realities that permeate certain types of situations. A child abused by a parent is bereft of any refuge and is perhaps the most helpless and powerless of all victims, betrayed by the very person to whom he or she would most naturally turn for succor. We deal here not with theoretical quibbles over abstract social concepts, but with the urgent plight of those who most need the protective hand of the [s]tate. We also emphasize that the effects of applying the exclusionary rule in a child protective proceeding would potentially be immeasurably more devastating than is true of the typical criminal prosecution. Normally, in a criminal prosecution, if application of the rule prevents the conviction of a guilty person, the result will be that a past crime goes unpunished. It is a price society has been willing to pay to prevent unwarranted intrusions upon person or property. Here, however, if application of the rule leads to an erroneous finding that there has been no abuse, the result may be

to condemn an innocent child to a life of pain and fear or even to death . . . . Where the result would be so abhorrent, utilization of a rule normally intended to provide protection from illegal police activity is not justifiable.

"Nor does the potential impact upon a parent of a child protective proceeding require application of the rule. The possible consequences range from an order placing the child under the supervision of a child protective agency while remaining in parental custody to temporary removal of the child for an initial period of up to [eighteen] months . . . . Certainly, such potential interference in family relationships evokes the need for limited constitutional protections, albeit not to the same extent as would a proceeding to permanently remove the child . . . . These potential consequences, however, are not intended to punish the parent, but rather to protect the child. The effect on the parent is but a necessary collateral result of the need to safeguard the child. . . . The [l]egislature has specifically declared that the purpose of a child protective proceeding is 'to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being' and to act 'on behalf of a child so that his needs are properly met' . . . . On balance, the [s]tate's interest in protecting abused children and the unthinkable consequences to the children if they are left in the hands of abusive parents far outweigh the potential consequences to the parents." (Citations omitted.) Id., 357–58. Accordingly, the court concluded "that because a child protective proceeding itself is not punitive in nature and the deterrent effect of the exclusionary rule will be adequately served by precluding use of the evidence in any related criminal proceeding, the [s]tate's interest in protecting its children mandates the admissibility of relevant evidence seized during an illegal search." Id., 358.

In *State ex rel. A.R.* v. *C.R.*, 982 P.2d 73 (Utah 1999), the Supreme Court of Utah also addressed the applicability of the exclusionary rule to a child protection proceeding. In doing so, the court stated: "In light of the purpose of the exclusionary rule, as well as the [s]tate's interest in protecting children, it is improper to exclude evidence discovered during a warrantless search in subsequent child protection proceedings. State officials confronting the possibility of child abuse or neglect— emergencies that occasionally lead to child protection proceedings—do not ordinarily seek to uncover incriminating evidence during the warrantless searches incidental to these investigations. There is little incentive to violate the [f]ourth [a]mendment because these officers do not usually act with the object of obtaining evidence for criminal prosecution.

"There appears to be little likelihood that any substantial deterrent effect on unlawful police intrusion would be achieved by applying the exclusionary rule to child protection proceedings. Whatever deterrent effect there might be is far outweighed by the need to provide for the safety and health of children in peril. Although it is difficult to empirically document the impact of the exclusionary rule . . . the very paucity of exclusionary rule cases in the context of child welfare proceedings indicates that allegations of improperly obtained evidence in such proceedings are rare. Thus, extension of the exclusionary rule to such cases does not promise to add significant protection to . . . [f]ourth [a]mendment rights." (Citation omitted; internal quotation marks omitted.) Id., 78–79; see also *In re Mary S.*, 186 Cal. App. 3d 414, 418, 230 Cal. Rptr. 726 (1986) ("[a] parent at a dependency hearing cannot assert the [f]ourth [a]mendment exclusionary rule, since 'the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence'

unlawfully seized"), review denied, California Supreme Court (December 3, 1986).

The reasoning underlying the refusal to apply the exclusionary rule to child protection cases as set forth in these cases can be analogized to the present animal welfare action. Animals, like children, are part of a vulnerable class, and the primary purpose of the animal protection statute, § 22-329a, like the child protection statutes, is to protect the safety and welfare of animals that are subjected to neglect and cruel treatment. Animals are dependent on their owners to provide the necessary food, shelter and care for their health and well-being, and when they are subjected to abuse and cruelty at the hands of their owners, they are helpless and in need of the protective hand of the state. As this court previously has stated, the state has a "significant interest in protecting the welfare of neglected or cruelly treated animals . . . ." *Wethersfield ex rel. Monde* v. *Eser*, supra, 211 Conn. App. 558. If we were to apply the exclusionary rule to cases in which the welfare of an animal is threatened, we would prevent the state from being able to offer crucial evidence related to the neglect or abuse of animals that could be used to help remove the animal from such an environment. Consequently, the social cost resulting from application of the exclusionary rule in this context is that the protection of animals would be hindered.

With respect to any benefit, or the deterrent effect, of applying the exclusionary rule in the present situation, we note that our Supreme Court previously has stated that there is "only a marginal deterrent effect . . . [in cases when] there [is] already a deterrent effect created by the application of the rule to any criminal proceedings, and because the use of evidence in a [civil] proceeding falls outside a [law enforcement] officer's zone of primary interest . . . that exclusion of such

evidence will not significantly affect a [law enforce-ment] officer's motivation in conducting a search." (Internal quotation marks omitted.) *State* v. *Jacobs*, 229 Conn. 385, 391, 641 A.2d 1351 (1994). The deterrent effect of applying the exclusionary rule in this context, therefore, would be minimal. See *Pennsylvania Board of Probation & Parole* v. *Scott*, supra, 524 U.S. 364 (discussing minimal deterrence benefit of applying exclusionary rule to civil parole revocation hearing because "application of the rule in the criminal trial context already provides significant deterrence of unconstitutional searches"). Notably, there are analo-gous criminal statutes, such as § 53-247, that allow for the criminal prosecution of individuals who neglect or abuse animals, and any criminal proceedings stemming from violations of those statutes would, of course, be subject to the exclusionary rule. As in *Matter of Diane P.*, we embrace the proposition that the use of illegally seized evidence in an animal welfare case would not impact a subsequent "related criminal prosecution because normal application of the exclusionary rule would in any event preclude use of that evidence in the criminal prosecution." *Matter of Diane P.*, supra, 110 App. Div. 2d 358. Accordingly, the potential harm to animals from allowing them to remain in an environ-ment in which they are being neglected or cruelly treated outweighs any deterrent effect that would result from suppressing evidence unlawfully seized. More-over, the minimal deterrent effect of applying the exclu-sionary rule in the present case is substantially out-weighed by the societal interest in having otherwise reliable and relevant evidence concerning animal neglect and cruelty presented at an animal welfare proceeding seeking to remove the animal from such circumstances.

We also emphasize that, in the absence of imminent harm to an animal, the typical procedure as set forth under § 22-329a (b) for an animal control officer to

enter a premises is by first obtaining a warrant.[33] That is the procedure established by the statute, and animal control officers need to be properly trained to follow that procedure. Our decision today does not condone the warrantless entry of private residences.[34] Instead, we are charged with deciding whether, under the circumstances here, in which that procedure was not followed, the exclusionary rule, which is a judicially created doctrine that historically applies in the context of criminal trials, should be extended and applied to the present civil animal welfare proceeding. Our application of the *Janis* balancing test leads us to conclude that it should not, given that the application of the rule

[33] See *Wethersfield ex rel. Monde* v. *Eser*, supra, 211 Conn. App. 550–51 ("According to the legislative history, the process in § 22-329a (a) for taking physical custody of animals in imminent harm is not the norm. Rather, the usual process is codified in § 22-329a (b), which provides in relevant part that '[a]ny animal control officer or regional animal control officer . . . may take physical custody of any animal upon issuance of a warrant finding probable cause that such animal is neglected or is cruelly treated . . . .' ").

[34] Indeed, such warrantless entries may subject an animal control officer to civil liability for the illegal search and seizure, regardless of whether the defendant can rely on illegally obtained evidence in this animal welfare proceeding. See, e.g., *Newsome* v. *Bogan*, 617 F. Supp. 3d 133 (W.D.N.Y. 2022) (action by dog owner against, inter alia, police officers and animal control officer pursuant to 42 U.S.C. § 1983 alleging that defendants searched his apartment and seized his dogs without warrant in violation of fourth amendment to federal constitution); *Christensen* v. *Quinn*, 45 F. Supp. 3d 1043 (D.S.D. 2014) (owner of dog breeding operation brought action against various county and state officials, county's animal control services provider, and animal rights groups, under § 1983 alleging violations of his fourth amendment rights); see also *O'Neill* v. *Louisville/Jefferson Metro Government*, 662 F.3d 723, 727, 732 (6th Cir. 2011) (dog owners brought § 1983 action against various government officials, including director of city animal control agency, alleging violations of fourth and fourteenth amendments stemming from warrantless search of dog owners' home and seizure of dogs). This threat of civil liability will adequately deter animal control officers from violating the fourth amendment, regardless of whether the exclusionary rule applies in civil cases. See *Hudson* v. *Michigan*, 547 U.S. 586, 597–98, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006). The "additional marginal deterrence" of applying the exclusionary rule in this context would not "outweigh the societal cost of excluding relevant evidence and decreasing the possibility of obtaining accurate factual findings." *Jonas* v. *Atlanta*, 647 F.2d 580, 588 (5th Cir. Unit B June 1981).

would yield a minimal deterrence benefit while at the same time it would frustrate and hinder the purpose of our animal welfare statute and the protection of animals.

Accordingly, the trial court's ruling denying the defendant's motion in limine was legally and logically correct.

## II

We now turn to the defendant's claim that her right to a jury trial under article first, § 19, of the Connecticut constitution was violated. The defendant argues in support of this claim that the government may forfeit the property of an individual only "if it allows [the individual] to contest that position in a court of law before a jury," and that because § 22-329a provides for a hearing before a court only, as opposed to a jury trial, before allowing the court to vest ownership of the animals with the plaintiff, the statute violates her state constitutional right to a jury trial. The defendant concedes that she never requested a jury trial and, thus, that this claim was not preserved but argues that it is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

Our resolution of this claim is governed by this court's decision in *Delahunty* v. *Targonski*, 158 Conn. App. 741, 746–50, 121 A.3d 727 (2015). In *Delahunty*, "[t]he sole claim raised by the plaintiff in her appeal [was] that she was denied her state constitutional right to a trial by a jury. Specifically, she argue[d] that the case was claimed for a jury trial, albeit by [the third-party defendants], and the denial of her right to a jury trial constituted structural error. She concede[d] that th[e] claim was not preserved and [sought] review under *State* v. *Golding*, supra, 213 Conn. 239–40. See, e.g., *State* v. *Elson*, 311 Conn. 726, 743, 91 A.3d 862 (2014) (bedrock principle of appellate jurisprudence that

appellate courts generally will not review unpreserved claims made for first time on appeal). We conclude[d] that, under the facts and circumstances of th[e] case, she waived her right to a jury trial and therefore her claim fail[ed] to satisfy the third prong of *Golding*.

"In *State* v. *Golding*, supra, 213 Conn. 239–40, our Supreme Court stated that 'a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances.' . . . *Golding* applies in civil as well as criminal cases. . . .

"We are mindful that '[i]n the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, *at least was not waived at trial.* . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial. . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court.' . . . *State* v. *Reddick*, 153 Conn. App. 69, 80–81, 100 A.3d 439, [cert.] dismissed, 314 Conn. 934, 102 A.3d 85 [2014], and cert.

denied, 315 Conn. 904, 104 A.3d 757 (2014); see also *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70–71, 967 A.2d 41 (2009); *State* v. *Fabricatore*, 281 Conn. 469, 481–83, 915 A.2d 872 (2007). Simply put, a constitutional claim that has been waived does not satisfy the third prong of *Golding*. . . .

"We recently discussed waiver in the context of a claim made pursuant to the *Golding* doctrine. '[W]aiver is [t]he voluntary relinquishment or abandonment— express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]*aiver may be effected by action of counsel*. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding. . . .

" 'It is well established that implied waiver . . . arises from an *inference* that the defendant knowingly and voluntarily relinquished the right in question. . . . Waiver does not have to be express . . . but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so. . . . It also is well established that any such inference must be based on a course of conduct. . . . Relevant cases inform us that a criminal defendant may implicitly waive one or more of his or her fundamental rights. . . . In some circumstances, a waiver of rights must be knowing, voluntary and intelligent, and it must be expressly made. . . . In other circumstances, waiver can be implied . . . [and] [t]he waiver can be made by counsel . . . .' " (Citations omitted; emphasis in original.) *Delahunty* v. *Targonski*, supra, 158 Conn. App. 746–49.

The court in *Delahunty* further stated: "In criminal cases, our Supreme Court has held that the defendant

must personally waive the fundamental right to a jury trial and there must be some affirmative indication from the defendant, on the record, that he or she knowingly, intelligently and voluntarily has waived the right to a jury trial. *State* v. *Gore*, 288 Conn. 770, 777–78, [955] A.2d 1 (2008). It also has recognized, however, that a lower standard for waiving the right to a jury applies in civil cases. *L & R Realty* v. *Connecticut National Bank*, 246 Conn. 1, 14, 715 A.2d 748 (1998) (appropriate to apply lower standard in determining enforceability of prelitigation contractual jury trial waivers than for waivers in criminal case); see also *Fuentes* v. *Shevin*, 407 U.S. 67, 94–95, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972) (standards for waivers of rights in criminal case would not necessarily apply to civil litigation).

"A party may forfeit the right to a jury trial in a civil case if the right is not asserted in a timely manner, may abandon the right to a jury trial if he or she chooses a forum that does not afford the right to a jury trial, or may waive the right to a jury trial. *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 10; see *Anastasia* v. *Mitsock*, Superior Court, judicial district of New Haven, Docket No. CV-05-4012156-S, 2006 WL 3759402 (December 1, 2006) (42 Conn. L. Rptr. 453, 454) (summary of law since 1899 that failure to claim civil action to jury within thirty days of return date or within ten days after an issue of fact has been joined amounts to voluntary and intentional relinquishment of right to jury trial); see also General Statutes §§ 51-239b and 52-215.

"In the present matter, the plaintiff did not claim the case for a jury trial. The . . . [third-party] defendants, filed the claim for a jury trial. On April 18, 2013, the [third-party defendants] filed a motion for a court trial and certified that a copy of their motion was sent to the plaintiff's counsel. In a handwritten notation dated April 29, 2013, the court granted the . . . motion by

agreement and noted that the plaintiff's counsel was present. The motion to withdraw the [third-party] complaint was filed by the defendants on May 31, 2013. Most importantly, the plaintiff appeared for a trial by the court and never raised any objection to the proceedings, namely, the absence of a jury. We conclude that, under the facts and circumstances of this case, the plaintiff waived her constitutional right to a jury trial." (Footnotes omitted; internal quotation marks omitted.) *Delahunty* v. *Targonski*, supra, 158 Conn. App. 749–50.

This court explained further in *Delahunty* that "[t]he failure of the plaintiff to raise an objection at the start of the court trial, after receiving notice that the [third-party] defendant had moved for a court trial and that there had been no jury selection, combined with her active and full participation in the ensuing trial, indicate[d] that she had acquiesced to a court trial and correspondingly relinquished her right to a jury trial. She failed to object at the start of the court trial, when there was time to present the matter to the court, so that a possible error could be addressed and corrected if necessary. Instead, she remained silent and participated fully in the court trial. Only after receiving nominal damages did the plaintiff seek to exercise her right to a jury trial. Put another way, the plaintiff now seeks a proverbial second bite at the apple after receiving an award that was less than she had hoped for. We cannot endorse such a tactic, as it amounts to an ambush of both the trial court and the opposing party. We will not reward the plaintiff with a new trial based on a situation that was caused in part by her failure to raise an objection. . . . We conclude that, under these facts and circumstances, the plaintiff waived her right to a jury trial. As a result, her claim fails under the third prong of *Golding.*" (Citation omitted.) Id., 751–52.

As in *Delahunty*, the defendant in the present case never requested a jury trial. Moreover, she failed to

raise any objection prior to the commencement of the hearing before the court and she actively participated in it. On this basis, we conclude that the defendant waived her claim that she was entitled to a jury trial under the state constitution. As a result, she cannot demonstrate a constitutional violation under the third prong of *Golding*.[35] Her claim, therefore, fails.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[35] In light of our determination that the defendant waived her unpreserved jury trial claim, we need not reach the merits of her claim that she has a right to a jury trial under the state constitution in an animal welfare action pursuant to § 22-329a, nor do we need to address the case relied on by the defendant in her notice of supplemental authority—*Securities & Exchange Commission* v. *Jarkesy*,     U.S.     , 144 S. Ct. 2117, 219 L. Ed. 2d 650 (2024)—which concerns the right to a jury trial under the seventh amendment to the federal constitution.